1

2

3

4

5

6

7                   UNITED STATES DISTRICT COURT

8                       DISTRICT OF OREGON

9                       PORTLAND DIVISION

10

11

12   IRENE CRANSTON,                      No. 3:12-cv-02101-HU

13       Plaintiff,                       **FINDINGS AND**
                                          **RECOMMENDATION**
14       v.

15   CAROLYN W. COLVIN**,** Acting
     Commissioner of Social Security,
16
         Defendant.
17   ─────────────────────────────

18   Merrill Schneider
     Schneider Kerr & Gibney
19   P.O. Box 14490
     Portland, OR 97293
20
         Attorney for Plaintiff
21

22   S. Amanda Marshall
     United States Attorney
23   Adrian L. Brown
     Assistant United States Attorney
24   1000 SW Third Avenue, Suite 600
     Portland, OR 97204-2902
25
     Christopher J. Brackett
26   Social Security Administration
     701 Fifth Avenue, Suite 2900 M/S 221A
27   Seattle, WA 98104-7075

28       Attorneys for Defendant

     Page 1 - FINDINGS AND RECOMMENDATION

HUBEL, Magistrate Judge:

Plaintiff Irene Cranston ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act. This Court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C. § 405(g). For the reasons that follow, the Commissioner's decision should be AFFIRMED.

## PROCEDURAL BACKGROUND

Plaintiff applied for DIB on June 18, 2009. Plaintiff's application alleged a disability onset date of March 31, 2006. The application was denied initially on October 28, 2009, and upon reconsideration on June 8, 2010. Plaintiff appeared and testified at a hearing held on May 13, 2011, before Administrative Law Judge ("ALJ") Sue Leise. The ALJ issued a decision denying Plaintiff's claim for benefits on June 24, 2011. Plaintiff then requested review of the ALJ's decision, which was subsequently denied by the Appeals Council on September 19, 2012. As a result, the ALJ's decision became the final decision of the Commissioner that is subject to judicial review. This appeal followed on November 19, 2012.

## FACTUAL BACKGROUND

On April 1, 2004, Plaintiff visited Dr. Gary Pape at Providence Medical Group in Clackamas, Oregon, complaining of back pain. Dr. Pape noted that Plaintiff had a history of abusing narcotic medications and that he had "made it clear to [Plaintiff] on a couple of occasions that [he was] not going to give her any further narcotics." (Tr. 483.)

Page 2 - FINDINGS AND RECOMMENDATION

On August 20, 2004, Plaintiff visited Dr. William Rasor at Division Street Family Practice in Oregon City, Oregon, regarding ongoing treatment of back pain, depression and anxiety. Dr. Rasor's treatment notes indicate that a December 2003 magnetic resonance imaging ("MRI") of Plaintiff's spine revealed mild spinal stenosis; Plaintiff responded well to an epidural injection; Plaintiff had been taking Klonopin (clonazepam) and Prozac (fluoxetine); Plaintiff received samples of Lexapro (escitalopram oxalate) after reporting that her sister responded favorably to the medication; and Plaintiff "had been unable to stay on contract for her opioids [in the past], so for this reason [Dr. Rasor was] staying away from opioids."[1] (Tr. 398.)

On November 4, 2004, Plaintiff visited Dr. Pape complaining of a cough and pain in her lower back and left groin. Since Dr. Pape concluded that Plaintiff "seem[ed] most interested in getting pain medicines," he once again informed Plaintiff that "she [wa]s not going to receive narcotics" from Providence Medical Group in Clackamas. (Tr. 480.) Dr. Pape also felt that Plaintiff "was seeking a narcotic [to treat her cough] and [h]e would not give her one." (Tr. 480.)

On March 24, 2005, about one year before the alleged disability onset date, Plaintiff began receiving treatment for lower back pain and fibromyalgia at Pain Relief Specialists Northwest, P.C. ("PRSN") in Gresham, Oregon. Plaintiff was referred to PRSN by a Dr. Cha, who had been prescribing fifty tablets per month of Vicodin (hydrocodone and acetaminophen) and

---

[1] For clarity, the Court refers to medications prescribed to Plaintiff by a single drug or brand name whenever possible.

Page 3 - FINDINGS AND RECOMMENDATION

who presumably worked for Adventist Health. (Tr. 249, 277, 523.) Plaintiff reported that the current dosage of Vicodin was inadequate and that she would like to try OxyContin (oxycodone hydrocholoride) because "[h]er sister had good luck with [the medication] in the past." (Tr. 279.) Dr. James Kim noted that an MRI of the lumbar spine revealed a moderate disc bulge and prescribed sixty twenty-milligram OxyContin pills.

Over the course of the next year, Plaintiff visited PRSN on a near-monthly basis and received prescriptions for (1) ninety Vicodin pills and ninety five-milligram methadone pills on April 28, 2005; (2) ninety Vicodin pills and ninety thirty-milligram morphine pills on May 17, 2005; (3) 120 Percocet (oxycodone and acetaminophen) pills and ninety thirty-milligram morphine pills on July 7, 2005; (4) 120 Percocet pills and 120 five-milligram methadone pills on September 23, 2005; (5) 120 Percocet pills and 120 five-milligram methadone pills on October 24, 2005; (6) 120 Percocet pills and 120 five-milligram methadone pills on November 29, 2005; (7) 120 Percocet pills and 120 five-milligram methadone pills on December 27, 2005; (8) 120 Percocet pills and seventy-five ten-milligram methadone pills on January 25, 2006;[2] and (9) 110 Vicodin pills and sixty thirty-milligram morphine pills on March 1, 2006.[3]

---

[2] The treatment note from this visit indicates that Plaintiff began taking clonidine to suppress narcotic withdrawal symptoms (sweating) and that she had been working up to fifty hours a week at the retail store T.J. Maxx. (Tr. 176, 178, 299.)

[3] It appears that Plaintiff's prescriptions for Vicodin consisted of five or ten milligrams of hydrocodone and 325 or 500 milligrams of acetaminophen, and her prescriptions for Percocet consisted of five milligrams of oxycodone and 325 milligrams of

Page 4 - FINDINGS AND RECOMMENDATION

During that same time period, Plaintiff was receiving monthly refills of Klonopin from Dr. Rasor, including one for ninety one-milligram Klonopin pills on March 7, 2006. (Tr. 394-96.) Ten days later, Plaintiff visited Dr. Gregory Garcia at Providence Medical Group in Clackamas, complaining of panic attacks, anxiety and fibryomyalgia. Plaintiff said the last physician she saw was Dr. Henry Rivas, who was "hesitant to prescribe clonidine" and who presumably worked for Adventist Health. (Tr. 246, 477.) Plaintiff informed Dr. Garcia that she "wanted a prescription for Vicodin" and wanted to increase her dosage of Klonopin. (Tr. 477.) Dr. Garcia provided Plaintiff with "a few Vicodin," despite noting that prior primary care providers "would not prescribe her the medication." (Tr. 476-77.)

On April 17, 2006, less than three weeks after the alleged disability onset date, Plaintiff told a physician's assistant at PRSN, Sylvia Southworth ("Southworth"), that she was fired by T.J. Maxx "because she called in a lot when she was given more than [thirty hours] per week."[4] (Tr. 307.) During the consultation,

_____

acetaminophen. It also appears that Plaintiff may have received prescriptions in August 2005 and February 2006. (Tr. 287, September 2005 treatment note indicating that Plaintiff switched back to methadone during her last visit with Dr. Kim after reporting morphine-related side effects, and that she wanted her methadone dosage increased; Tr. 303, drug test dated February 21, 2006, suggesting that Plaintiff tested positive for morphine and negative for methadone; Tr. 304-06, March 2006 treatment note indicating there had been a recurrence of the morphine-related side effects reported to Dr. Kim and that Vicodin and morphine were prescribed, without the usual specification about there being "new medications added" anytime there was an alteration to the drug, dose or brand name).

[4] Plaintiff did not work for the remainder of the year. (Tr. 176, 178.)

Page 5 - FINDINGS AND RECOMMENDATION

Southworth wrote Plaintiff a prescription for ninety Percocet pills and ninety sixty-milligram morphine pills.

An April 18, 2006 MRI of Plaintiff's lumbar spine, ordered by Dr. Edward McCluskey of PRSN, revealed: (1) "[m]inimal to mild disc bulging at multiple levels, not displacing or compressing any of the traversing nerve roots," (2) "[e]ncroachment on neural foramina," and (3) "[d]egenerative disc disease, moderate at L5-S1 and mild elsewhere in the lumbar spine." (Tr. 311).

Over the course of the next eight months, Plaintiff continued to receive monthly refills of Klonopin from Dr. Rasor. She also received prescriptions from Southworth for: (1) ninety Percocet pills, ninety sixty-milligram morphine pills and twenty thirty-milligram morphine pills on May 15, 2006; (2) 104 Percocet pills, ninety 800-milligram Skelaxin (a muscle relaxant) pills, ninety sixty-milligram morphine pills, and sixty thirty-milligram morphine pills on July 10, 2006; (3) ninety Percocet pills, ninety 800-milligram Skelaxin pills, sixty fifteen-milligram morphine pills, and sixty sixty-milligram morphine pills on August 9, 2006; (4) ninety Percocet pills and sixty sixty-milligram morphine pills on September 7, 2006; (5) 120 Percocet pills and 180 fifteen-milligram morphine pills on October 5, 2006; (6) 120 Percocet pills and 240 fifteen-milligram morphine pills on November 2, 2006; and (7) 120 Percocet pills and sixty morphine sixty-milligram pills on December 12, 2006.

On January 10, 2007, Plaintiff visited Dr. Pape complaining of left shoulder pain stemming from a recent motor vehicle accident. Dr. Pape's treatment notes indicate that Plaintiff had reported to the emergency room at Portland Adventist Medical Center, where she

Page 6 - FINDINGS AND RECOMMENDATION

1  was told it was a strain and given hydrocodone and Diazepam (a
2  muscle relaxant).    Dr. Pape proceeded to write Plaintiff a
3  prescription for an additional thirty Vicodin pills.

4      On February 9, 2007, Plaintiff visited Southworth and
5  indicated that she had decided to "go to detox [in a few weeks] so
6  she c[ould] get off all her pain med[ications]."    (Tr. 334.)
7  Plaintiff told Southworth that morphine was "making her very
8  emotional again."[5]    (Tr. 334.)    In accordance with Plaintiff's
9  requests, Southworth placed a called to Providence Portland Medical
10  Center and provided Plaintiff with a prescription for 120 Percocet
11  pills and sixty sixty-milligram morphine pills since Plaintiff said
12  there was a chance "she might change her mind." (Tr. 336.)

13      On February 25, 2007, Plaintiff was admitted to a drug
14  treatment program at Providence Portland Medical Center. Plaintiff
15  provided the following statement as to why she sought treatment:
16  "It's just time.    I want a life.    I'm not going to have it on
17  drugs.    I was sitting at home wondering why I was sitting there
18  stuck in the house or [sic] out cross training and I knew why, it
19  was the drugs." (Tr. 339.)    Dr. Andris Antoniskis noted that
20  Plaintiff thought "her level of functioning [wa]s actually
21  decreased because of her opiate and [Klonopin] use." (Tr. 345.)
22  Dr. Antoniskis suggested that Plaintiff could better manage her
23  pain through "physical therapy, weight reduction, and possible
24  local steroid injections."    (Tr. 345.)    Indeed, "[o]ne big
25  realization for [Plaintiff] during [the drug] treatment was that
26
27
28      [5] Shortly thereafter, Plaintiff told Dr. Rasor that "she was
becoming too dependent on Klonopin." (Tr. 392.)

Page 7 - FINDINGS AND RECOMMENDATION

she could no longer take [Klonopin] or drink.  Prior to admission she only planned on quitting opiates."  (Tr. 340.)

On March 5, 2007, Plaintiff's husband called to inform Dr. Rasor that Plaintiff was detoxing from Klonopin and morphine.  The treatment notes from the Division Street Family Practice indicate that Dr. Rasor was not aware that Plaintiff was receiving morphine from a pain clinic.  Four days later, on March 9, 2007, Plaintiff was discharged from the drug treatment program at Providence Portland Medical Center and received a Global Assessment of Function ("GAF") rating of 55.[6]

On March 21, 2007, Plaintiff had a consultation with Dr. Norm Thiesen, a psychologist at Cornerstone Clinical Services in Milwaukie, Oregon, who noted that Plaintiff had a "clearer head, more ability to concentrate, better decision making, pain under control, [and a] very positive outlook."  (Tr. 354.)  Two days later, on March 23, 2007, Plaintiff visited Dr. Rasor complaining that her anxiety had markedly increased.  Apparently, Plaintiff and her husband "both decided that she [wa]s not going to be able to get by, at least at this time, without the Klonopin again."  (Tr. 391.)  Dr. Rasor wrote Plaintiff a prescription for ninety one-milligram Klonopin pills.

---

[6] "The GAF scale considers psychological, social, and occupational functioning on a hypothetical continuum of mental health . . . , with serious symptoms or impairment in functioning at a score of 50 or below." *Lee v. Comm'r Soc. Sec.*, 529 F. App'x 706, 716 n.1 (6th Cir. 2013).  "The Commissioner has no obligation, however, to credit or even consider GAF scores in the disability determination." *Tuthill v. Colvin*, No. 12-cv-7666, 2013 WL 5743278, at *6 (C.D. Cal. Oct. 23, 2013).

1    On April 20, 2007, Plaintiff had a follow-up visit at the
2  Division Street Family Practice with Dr. Rasor and reported that
3  she felt "more comfortable getting out, a lot less anxiety being
4  back on her Klonopin." (Tr. 409.) Plaintiff also received a
5  prescription from Dr. Rasor for thirty ten-milligram Flexeril to
6  treat fibromylagia related pain.

7    On May 17, 2007, Plaintiff was referred to Carla Crockford
8  ("Crockford"), a psychiatric mental health nurse practitioner at
9  Cornerstone Clinical Services, by Dr. Thiesen. Crockford's
10  treatment notes indicate that she diagnosed Plaintiff with
11  posttraumatic stress disorder and that Plaintiff began a new job
12  stocking cards for Hallmark Marketing Corporation ("Hallmark")
13  between late May 2007 and late June 2007. (Tr. 177, 510.) During
14  a consultation on August 9, 2007, Crockford noted that Plaintiff
15  "went over again" and was "overusing Klonopin," to the tune of
16  eight one-milligram pills per day. (Tr. 509.)

17    On October 11, 2007, Plaintiff called Dr. Rasor's office
18  because she "wanted [a] pain med[ication] stronger than Flexeril."
19  (Tr. 408.) Jackie Beckwith ("Beckwith"), a family nurse
20  practitioner at Dr. Rasor's office, the Division Street Family
21  Practice in Oregon City, chose instead to provide Plaintiff with
22  Xanax (used to treat anxiety disorder and panic attacks), Zanaflex
23  (a skeletal muscle relaxant) and Ativan (an anti-anxiety drug).

24    On December 11, 2007, Dr. Rasor's office received a call from
25  a pharmacist at Safeway, indicating that Plaintiff accidently
26  received a prescription for Vicodin and had agreed to bring back
27  the medication. When Plaintiff returned to retrieve a prescription
28  for Zanaflex that had been called in earlier that day, she told the

Page 9 - FINDINGS AND RECOMMENDATION

pharmacist "she got scared and flushed the Vicodin down the toilet." (Tr. 406.) The matter was brought to the attention of Dr. Rasor. (Tr. 406.)

On January 7, 2008, Plaintiff had a follow-up visit with Beckwith regarding persistent ear pain and vertigo. Plaintiff reported that she had been using Vicodin pills to successfully control her pain and, for some reason which is not explained in the record, Beckwith called in "a refill" for forty Vicodin pills to the Safeway pharmacy. (Tr. 405.) Beckwith prescribed an additional twenty Vicodin pills on January 24, 2008, after Plaintiff called the clinic complaining of continued ear pain. (Tr. 405.)

It should be noted that, in mid-September 2007, Plaintiff started picking up prescriptions at the Safeway near Powell Boulevard with a telephone number of 503-766-6688. (Tr. 390, 408.) The medication log from Beckwith and Dr. Rasor's office, the Division Street Family Practice in Oregon City, indicates that Plaintiff was never prescribed Vicodin between the time when she was discharged from the drug treatment program in March 2007 and February 2, 2008. (Tr. 390.) Beckwith's treatment notes from January 7, 2008 appear to be inconsistent with the prescribing history described in her office's medication log, and the record does not explain this inconsistency.

On February 1, 2008, Plaintiff received a refill of Zanaflex after reporting continued vertigo and being told she "must be seen [first]." (Tr. 405.) Three days later, on February 4, 2008, Plaintiff had a follow-up visit with Beckwith who noted that she had declined Plaintiff's latest request for more Vicodin, absent

Page 10 - FINDINGS AND RECOMMENDATION

any further consultation.  At the conclusion of the consultation, Beckwith provided Plaintiff with a refill of forty Vicodin pills. Plaintiff was provided an additional twenty-five Vicodin pills on April 25, 2008, but Beckwith noted that Plaintiff had "just now finished" the pills from February and was "being very careful and judicious about the use of them."  (Tr. 403.)

On June 3, 2008, Dr. Laura Roberts, a psychologist at Cornerstone Clinical Services, examined Plaintiff and diagnosed: "major depression, recurrent, moderate" and a history of opiate abuse and dependence (Axis I); deferred (Axis II); self-reports of fibromyalgia (Axis III); psychosocial and environmental stressors, such as the support of her family and isolation (Axis IV); and a GAF rating of 58 (Axis V).[7]  Plaintiff reported a recent back injury during the examination, but she was still exercising, playing with the family dog, putting in more effort to clean the house, and cooking more often.

On June 11, 2008, Plaintiff received a prescription from Beckwith for twenty-five Vicodin pills, after complaining about a recent flare-up of her back pain.  The next day, June 12, 2008,

_____

[7] The American Psychiatric Association employs a multiaxial evaluation process. *Rask v. Astrue*, No. 3:10-cv-01082-SI, 2011 WL 5546935, at *3 n.3 (D. Or. Nov. 14, 2011). "Axis I refers to the individual's primary clinical disorders that will be the foci of treatment; Axis II refers to personality or developmental disorders; Axis III refers to general medical conditions; Axis IV refers to psychosocial and environmental problems; and Axis V refers to the clinician's assessment of an individual's level of functioning, often by using a [GAF]." *Schwartz v. Barnhart*, 70 F. App'x 512, 516 n.1 (10th Cir. 2003). A GAF rating of 58 "indicates moderate symptoms or moderate difficulty in social occupational, or school functioning." *Gonzales v. Astrue*, No. H-10-1176, 2011 WL 3902739, at *7 n.3 (S.D. Tex. Sept. 2, 2011) (citation and internal quotation marks omitted).

Page 11 - FINDINGS AND RECOMMENDATION

Plaintiff had her yearly physical performed by Beckwith and reported that she had been taking a Vicodin pill every six hours due to the severity of the pain.   When the examination was complete, Beckwith called in a prescription for an additional forty Vicodin pills.[8]

On August 14, 2008, Plaintiff met with Dr. Roberts and reported that she received a "great performance review [at] work aside from slowness of work due to perfectionism." (Tr. 385.) Beckwith provided Plaintiff with refills of Vicodin on August 18 and August 26, 2008.  Also on August 26, 2008, Plaintiff called in to cancel an appointment with Dr. Roberts because she was feeling depressed.  (Tr. 386.)

On September 4, 2008, Plaintiff returned to Beckwith's office and reported that she "was unable to get her MRI because of the amount of copay that had to be paid." (Tr 422.)   Beckwith asked Plaintiff consider a referral to Spinal Diagnostics for steroid injections and provided her with a prescription for sixty Vicodin pills with a larger dose of hydrocodone.   Four days later, on September 8, 2008, Plaintiff called in and cancelled all future appointments with Dr. Roberts.  (Tr. 388.)

On September 16, 2008, Plaintiff had her Vicodin prescription called in two days early because she was "leaving town." (Tr. 422.)  During a follow-up visit on September 24, 2008, Plaintiff

---

[8] Beckwith provided Plaintiff with refills of forty Vicodin pills on June 20, June 26, July 2, July 8, July 15, July 21, July 25, July 30, and August 4, 2008.  Beckwith wrote Plaintiff a prescription for sixty Vicodin pills with a larger dose of hydrocodone during a follow-up visit on August 6, 2008.

told Beckwith that financial constraints prevented her from
obtaining an MRI or being referred to Spinal Diagnostics.

On October 1 and October 15, 2008, Plaintiff had her Vicodin
prescription refilled.  When she asked for an expedited refill on
the latter prescription, Plaintiff was told that she "ha[d] gotten
med[ications] early to[o] many times."  (Tr. 421.)  Plaintiff
received another refill of Vicodin on October 28, 2008.

On November 4, 2008, Plaintiff had a follow-up visit with
Beckwith and asked for her Vicodin prescription to be discontinued
since she did "not feel like it ha[d] the same efficacy" and
thought "more aggressive therapy" might be necessary.  (Tr. 420.)
Beckwith agreed and informed Plaintiff that she would not refill
her prescription.  Plaintiff had a follow-up visit with Crockford
the next day, November 5, 2008, and reported that she was no longer
working for Hallmark.  (Tr. 177-78, 493.)

On November 10, 2008, Plaintiff called the Division Street
Family Practice requesting a refill of Vicodin, which was initially
denied based on Beckwith's treatment note indicating that the
prescription was to be discontinued.  Two days later, on November
12, 2008, Beckwith called in a prescription for sixty Vicodin pills
with half the dose of hydrocodone (five instead of ten milligrams)
and left Plaintiff a message indicating that she needed to schedule
a follow-up visit.

On November 19, 2008, Plaintiff met with Beckwith to discuss
her ongoing pain, anxiety and depression.  Among other things,
Beckwith's treatment notes state:

> I am very concerned that this pain status continues to
> languish on, having to do with her lumbar spine and does
> not get addressed by being given more pain

1    medication. . . . I guess my next question then is that
2    if she was paying for two co-pays of Vicodin every month
     that it would be helpful [to her financial situation] if
3    she could get this fixed so she did not need as much
     Vicodin.

4    (Tr. 419.) Ultimately, however, Beckwith had Plaintiff "sign off

5    on a medication contract" and provided her with a one month's

6    supply of Vicodin (120 pills as opposed to sixty) containing ten

7    milligrams of hydrocodone. (Tr. 419.) Plaintiff had her Vicodin

8    prescription refilled the following month, on December 17, 2008.

9        On January 6, 2009, Plaintiff visited Beckwith because "she

10   experienced additional pain from just overworking her muscles both

11   in the snow and starting an exercise program, and [said] she

12   actually took up to [seven Vicodin] a day." (Tr. 418.) Beckwith

13   told Plaintiff that she was not in compliance with her pain

14   contract, but agreed to "go ahead and refill her medication early."

15   (Tr. 418.)

16       On January 22, 2009, the treatment notes from the Division

17   Street Family Practice suggest that Beckwith received a call from

18   Plaintiff indicating that "she ha[d] been out of oxycodone [sic,

19   Plaintiff does not appear to have been prescribed oxycodone prior

20   to this call] [for two] days [because she] 'took them faster than

21   [she] should have.'" (Tr. 417.) Beckwith refused the request for

22   an expedited refill, and as a result, Plaintiff did not receive her

23   refills of Vicodin until February 6, 2009, and March 5, 2009.

24       On March 17, 2009, Plaintiff had a follow-up visit with

25   Beckwith because "her Vicodin [wa]s totally ineffective." (Tr.

26   416.) Plaintiff told Beckwith "[s]he ha[d] heard about another

27   medicine that she heard might be more effective. It [wa]s

28   oxycodone, and she [wa]s interested to see if she c[ould] get put

Page 14 - FINDINGS AND RECOMMENDATION

on that." (Tr. 416.) Beckwith told Plaintiff she was not a good candidate for oxycodone and chose instead to wrote Plaintiff prescriptions for ten fentanyl patches and 120 Vicodin pills containing five milligrams of hydrocodone.[9] Beckwith took this step even though she felt Plaintiff was "actually looking pretty good" and "pretty energetic," and even though Plaintiff reported that she had joined Curves (a fitness and weight loss center for women), was "sleeping well and actually feel[ing] pretty good." (Tr. 416.)

On March 24, 2009, Plaintiff's husband called Dr. Rasor and reported that he came home early and found Plaintiff staggering with slurred speech. Plaintiff's husband was "quite agitated" and worried that Plaintiff was back on narcotic analgesics because she was "unable to tolerate it before." (Tr. 413, 415.) Dr. Rasor made a note that he understood this to be a reference to when Plaintiff was "going to a pain clinic that she did not tell us about; before she enrolled in detox," citing Plaintiff's chart notes from March 2007. (Tr. 415.) Dr. Rasor also made the following note: "No opioids!" (Tr. 415.)

On April 2, 2009, Plaintiff had a follow-up visit with Beckwith regarding her use of prescription medications. Towards the beginning of the treatment note, Beckwith states: "Apparently, Irene has been in therapy before to wean her from narcotic

---

[9] "Fentanyl is a very powerful pain-relieving drug, about 50 to 100 times stronger than morphine, often prescribed to cancer patients. Fentanyl comes in various forms, including gel patches that are placed on the skin so that the medicine can enter the bloodstream gradually over three days." *United States v. Thomas*, 489 F. App'x 688, 689 n.1 (4th Cir. 2012).

Page 15 - FINDINGS AND RECOMMENDATION

analgesics but she said that she took [the Vicodin and fentanyl patches from this clinic] on purpose, knowing what the reaction would be and she did not care, she wanted to take them." (Tr. 413.) Beckwith went on to state:

> [Irene] said she is doing fairly well. She apologized for her lack of directness in communicating with us, her history with this and instead went ahead and took the medicine knowing that she would have some difficulties with it. She said that otherwise she has really no complaints. She is complaining of some back pain and neck pain; however, this is pretty chronic. It is not significantly changed from what it has been in the past and she does seem to be tolerating it well.

(Tr. 413.) Beckwith reluctantly provided Plaintiff with a prescription for Xanax, presumably due to the fact that Plaintiff had used nearly a one month's supply of Xanax (100 out of 135 pills) over the course of eight days in March 2009. (Tr. 415.)

On May 6, 2009, Plaintiff informed the Division Street Family Practice that she was changing providers and asked that her medical records be released to Providence Medical Group in Clackamas. (Tr. 410-11.) Around the same time, Plaintiff was seen by Dr. Mhairi McFarlane at Providence Medical Group in Clackamas. Plaintiff told Dr. McFarlane that she was "currently going through a 12 step program to help her with her narcotic abuse." (Tr. 459.) She also reported "an L5-S1 disk [sic] bulge which causes her severe low back pain [but] she state[d] that [if] she works out it feels better." (Tr. 459.)

Dr. McFarlane was "quite concerned regarding the high dose of benzodiazepine" Plaintiff was taking in light of her "history of narcotic abuse and strong family history of alcoholism." (Tr. 460.) After reviewing Plaintiff's medication list, Dr. McFarlane went on to state: "It also appears that she was having clonazepam

Page 16 - FINDINGS AND RECOMMENDATION

prescribed by her psychiatric nurse practitioner and Xanax by her primary care provider. I wonder if they were aware that this was the case." (Tr. 460.)

On June 6, 2009, Plaintiff visited Crockford for the first time in seven months. Plaintiff reported that she was "hanging in there," attending Adult Children of Alcoholics ("ACA"), and having difficulties with memory and focus. (Tr. 490.) Crockford's treatment notes indicate that she planned to proceed with an assessment under the Conners' Adult ADHD Rating Scales ("CAARS") and instructed Plaintiff to continue taking her current medications, including Klonopin. Plaintiff completed the assessment later that month and began taking Ritalin. (Tr. 489, 570-72.)

On August 11, 2009, Plaintiff underwent an MRI of right knee at Providence Milwaukie Hospital, which revealed, among other things, a "[p]robable tear of the posterior root of the medial meniscus with slight outward extrusion of the meniscus." (Tr. 560.) Two days later, on August 13, 2009, Plaintiff had a follow-up visit with Crockford, who noted that Plaintiff's mood and affect appeared good. About three weeks later, Plaintiff left a voice mail with Crockford reporting positive results on seventy-two milligrams of Ritalin per day. (Tr. 568.)

On September 16, 2009, Dr. Steven Barry, a non-treating Disability Determination Services ("DDS") psychologist, examined Plaintiff. Among other things, Plaintiff reported that fibromyalgia impacted her memory and concentration; her anxiety impacted her ability to learn new information on job sites; she last worked for T.J. Maxx in March 2007, but she "couldn't catch

Page 17 - FINDINGS AND RECOMMENDATION

on" and was ultimately terminated for excessive absenteeism;[10] she hadn't seen a therapist in about a year; she had been clean and sober since March 2007, with the exception of a two-month relapse on painkillers beginning in February 2009; and she felt "very depressed and . . . volunteered, with such depression, 'I couldn't go to work.'" (Tr. 521, 524.)

Dr. Barry diagnosed posttraumatic stress disorder, obsessive compulsive disorder, opioid dependence self-reported to be in remission, and pain disorder associated with psychological factors and Plaintiff's general medical condition (Axis I); borderline personality disorder (Axis II); self-reports of back pain and fibromyalgia (Axis III); psychosocial and environmental stressors, such as children living on their own, fibromyalgia, poor coping skills, lack of mental health treatment, and applying for social security benefits (Axis IV); and a GAF rating of 38-50, noting self-reports of debilitating depression and pain (Axis V).

Dr. Barry expressed "substantial pessimism about meaningful and positive change in the future." (Tr. 526.) The most serious impairments, according to Dr. Barry, are in the following areas: (1) Plaintiff "could not be counted on to be consistent and dependable vis-a-vis getting to work on a regular basis"; (2) Plaintiff's "symptoms, her 'emotional reasons' are very public and 'out there' and . . . would rub off on others and interfere around others"; and (3) Plaintiff's somatic focus and "poor management and

---

[10] As discussed above, the record indicates that Plaintiff was fired by T.J. Maxx prior to April 17, 2006, and between roughly late May 2007 and early November 2008, she worked for Hallmark stocking cards.

control of affect . . . would interfere with her being able to
attend and focus on the job she might have." (Tr. 527).

On October 23, 2009, Dr. Richard Alley prepared a physical
residual functional capacity assessment on behalf of the agency.
After reviewing the record, Dr. Alley concluded that Plaintiff
could lift and/ or carry twenty pounds occasionally and ten pounds
frequently; stand, sit and walk about six hours in an eight-hour
workday; push and/ or pull "unlimited, other than as shown for lift
and/ or carry" (Tr. 531); climbs ramps and stairs frequently and
ladders, rope and scaffolds occasionally; stoop, kneel, crouch, and
crawl occasionally; had no manipulative, visual or communicative
limitations; and only needed to avoid hazards (machinery, heights,
etc.) in terms of environmental limitations.

On October 26, 2009, Dr. Bill Hennings, a state agency
psychologist, completed a mental residual function assessment after
reviewing Plaintiff's records. Dr. Hennings describes Plaintiff as
moderately limited in eight of twenty categories of mental activity
and not significantly limited in eleven, along with no evidence of
limitation when it comes to Plaintiff's ability to respond
appropriately to changes in work setting. Overall, Dr. Hennings
found that Plaintiff was capable of understanding and remembering
short, simple instructions; carrying out short, simple, routine
instructions; completing a normal workday and workweek; and
producing a "[w]ork pace consistency [that] would be acceptable for
many jobs." (Tr. 554).

Dr. Hennings also noted that Plaintiff's concentration,
persistence and pace would decline when performing detailed
instructions in light of her somatic focus; Plaintiff should not

Page 19 - FINDINGS AND RECOMMENDATION

work with the general public or in an environment that requires close contact and/ or coordination with coworkers "due to her mental symptoms and emotional behavior which tends to be expressed very publicly"; Plaintiff needs consistent supervision, but not "special supervision"; and vocational guidance could prove beneficial to "encourage mental health treatment and medication for management and control of affect/ symptoms." (Tr. 554.)

On October 29, 2009, Plaintiff had a follow-up visit with Crockford and reported that she was "[d]oing pretty good," Ritalin had "really helped," her knee was "75% better" after undergoing physical therapy, and she was "able to do more physically." (Tr. 567.) Crockford noted that Plaintiff's mood and affect were good. During the next follow-up visit on March 29, 2010, Plaintiff reported that she was still involved in ACA and she was "[d]oing okay" after the recent passing of her father. (Tr. 566.) Plaintiff's final visit with Crockford occurred on or about September 9, 2010, and Plaintiff was "overall doing well" at the time. (Tr. 563, 565.) Sometime shortly thereafter, Crockford relocated her practice and Plaintiff had to change providers.

On January 1, 2011, Lindsey Gossling, a psychiatric mental health nurse practitioner at Freedom Counseling Center, began treating Plaintiff. Among other things, Gossling's treatment notes indicate that Plaintiff had previously been diagnosed with attention deficit disorder, lost ninety pounds prior to about mid-

2009, and felt that Paxil and participation in ACA helped alleviate symptoms of obsessive compulsive disorder and depression.[11]

Gossling describes Plaintiff in her notes as conversant, euthymic in mood, logical and linear in expressing her thoughts, insightful, thoughtful, a reliable historian in terms of medications and their efficacy, engaged in an active recovery process, and functioning at a level she had never previously experienced. Gossling did reduce Plaintiff's dose of Ritalin on March 7, 2011, after Plaintiff reported difficulties copying with stress and anxiety. On March 31, 2011, however, Plaintiff indicated that the lower dose was not nearly as effective in treating her symptoms and was put back on her normal dose.[12]

On May 13, 2011, Erin Martz, a vocational expert ("VE"), testified at an administrative hearing before the ALJ. In her first hypothetical, the ALJ asked the VE to consider a fifty-one-year-old high school graduate who can lift and carry twenty pounds occasionally and ten pounds frequently; can stand, walk and sit a total of six hours in an eight-hour workday; can occasionally climb ramps and stairs; should never climb ladders, ropes or scaffolds;

---

[11] During the hearing held on May 13, 2011, Plaintiff stated: "I've lost [ninety] pounds and have kept it off for two years." (Tr. 54.)

[12] The treatment notes also indicate that Agnes White ("White"), a nurse practitioner at Adventist Health, called to inform Gossling "that she had prescribed for Irene in the past and found she was also getting [prescriptions] from a psych[iactric] provider. [White] flagged her in [the] reporting system and told Irene that she would share this info[rmation] with any provider [and would] be watching the system. At th[at] time there [wa]s no duplication of [prescriptions]." (Tr. 577, 588.) It appears that Plaintiff told Gossling that White thought she was doctor shopping after discovering that an unnamed narcotic was being prescribed. (Tr. 575.)

can occasionally stoop, kneel, crouch, and crawl; should avoid exposure to unprotected heights, dangerous machinery and other hazards; "can work in proximity to coworkers but should not work in . . like a teamwork environment" (Tr. 97); should have only superficial contact with the public; and can remember, understand and carry out simple and detailed, but not complex instructions or tasks typical of jobs with a Specific Vocational Preparation ("SVP") of one or two.[13]

After ruling out Plaintiff's past relevant work as a merchandise displayer, merchandise salesperson, cashier-checker and retail store manager, the VE testified that an individual with the above limitations could perform the jobs of cashier II (clerical, DOT 211.462-010) and garment sorter (DOT 222.687-014), both of which are light duty, unskilled positions with an SVP of two.[14] The ALJ then added to the hypothetical that the individual could only occasionally reach overhead bilaterally. After receiving clarification from the ALJ and consulting the Selected Characteristics of Occupations ("SCO"), the VE indicated that such an individual could perform the same jobs, noting in particular

_____

[13] SVP is a term of art used in the Dictionary of Occupational Titles ("DOT") to quantify "how long it generally takes to learn the job." *Powell v. Colvin*, No. CV 12-11044, 2013 WL 6797569, at *2 n.2 (C.D. Cal. Dec. 19, 2013) (citation omitted). The DOT defines an SVP of one as a "short demonstration only" and an SVP of two as anything beyond a short demonstration "up to and including [one] month." *Id.*

[14] The ALJ excluded Plaintiff's past work as a kitchen helper and fast food worker from consideration based on insufficient earnings.

that the job of garment sorter "would be primarily forward reaching" (Tr. 100), with only occasional reaching overhead.[15]

In her second hypothetical, the ALJ decreased the baseline number of hours the hypothetical individual could stand and walk in an eight-hour workday from six to two. The VE testified that she "would probably remove the job [of garment sorter]" (Tr. 102), but the number of appropriate cashier II (clerical) jobs would remain unchanged. The VE also stated that the hypothetical individual could perform the light duty, unskilled job of office helper (DOT 239.567-010), which has an SVP of two.

The ALJ then added to the hypothetical that the individual could not work in an environment that is fast-paced, such as an assembly-line job that is production-oriented. The VE testified that the individual could still perform the jobs of cashier II (clerical) and office helper. Once the ALJ added that the individual would be off-task twenty percent of the workday or be absent from work twice a month, the VE testified that competitive employment was no longer an option. When asked to confirm whether her testimony up to that point had been consistent with the DOT, the VE replied: "Yes, your honor." (Tr. 105.)

During cross-examination by Plaintiff's counsel, the VE testified that a limitation to sedentary work or occasional handling would preclude the hypothetical individual's ability to perform the jobs of office helper and cashier II (clerical).

---

[15]  The SCO "is a companion volume to the United States Department of Labor's DOT.  It may be used to supplement data in the DOT." *Gadke v. Comm'r of Soc. Sec.*, No. 1:12-cv-2875, 2013 WL 5428727, at *7 n.3 (N.D. Ohio Sept. 26, 2013).

Plaintiff's counsel then inquired about the degree of public contact and teamwork required for the job of cashier II (clerical). The VE testified that the degree of public contact and teamwork would be limited based on the independent, clerical nature of the position.   The VE could not say, however, that there would be absolutely no teamwork in an office environment.

When Plaintiff's counsel finished questioning the VE, the ALJ presented a third and final hypothetical.   Specifically, the ALJ asked the VE to consider an individual who can perform light work as defined under the regulations; can occasionally climb ramps and stairs; should never climb ladders, ropes or scaffolds; can occasionally stoop, kneel, crouch, and crawl; can occasionally reach overhead bilaterally; should avoid exposure to hazards, such as unprotected heights and dangerous machinery; "can work in proximity to coworkers but . . . shouldn't have close contact or coordination with coworkers" (Tr. 107); should have no contact with the general public; and can remember, understand and carry out simple and detailed, but not complex instructions or tasks typical of jobs with an SVP of one or two.[16]

---

[16] "Light work involves lifting no more than [twenty] pounds [occasionally] . . . with frequent lifting or carrying of objects weighing up to [ten] pounds.  Even though the weight lifted may be very little, a job is in this category when . . . it involves sitting most of the time with some pushing and pulling of arm or leg controls."   20 C.F.R. § 404.1567(b); *Lind v. Astrue*, 370 F. App'x 814, 816 (9th Cir. 2010); *see also Vickers v. Colvin*, No. 12-1445, 2013 WL 3071257, at *5 (C.D. Cal. June 18, 2013) ("Plaintiff's inability to stand and walk for more than two hours a day limits the number of light jobs she can perform, but it does not categorically exclude her from performing all light work.").

Once it was made clear to the VE the third hypothetical was merely an attempt to alter the baseline limitation to superficial contact with public to "no contact with the public, no work in the public" (Tr. 108), the VE provided the following testimony:

A. Okay. Well, in view that both [the jobs of cashier II and office helper] are clerical positions, of course there is some fluctuation based on the employer but we're talking about hypotheticals and the --

Q. Yes.

A. -- occupational titles for both the office helper, clerk, as well as the cashier, clerk, we can assume that, as described in the DOT, there is not public contact for those clerical positions.

Q. Okay.

A. And as far as the proximity to workers, but no close interaction. Again, they're both kind of independent . . . kinds of jobs, so, as I already addressed the issue about no strong need of teamwork. . . . You fulfill your tasks and pass on the information to other colleagues. So there would be no high level of teamwork [involved].

(Tr. 108.) Plaintiff's counsel declined any follow-up questions and the hearing concluded.

## THE FIVE-STEP SEQUENTIAL PROCESS

### A.  Legal Standard

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).  "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act."  *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011).  Those five steps are as follows:

Page 25 - FINDINGS AND RECOMMENDATION

> (1) Is the claimant presently working in a substantially gainful activity? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal [one of the listed impairments]? (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Id.* 724-25. The claimant bears the burden of proof for the first four steps in the process. *Bustamante v Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the burden at any of those four steps, then the claimant is not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails meet this burden, then the claimant is disabled, but if the Commissioner proves the claimant is able to perform other work which exists in the national economy, then the claimant is not disabled. *Bustamante*, 262 F.3d at 954 (citations omitted).

**B. The ALJ's Decision**

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity from her alleged disability onset date of March 31, 2006, through the date last insured of March 31, 2011.[17] At step two, the ALJ found that Plaintiff had the severe

---

[17] As noted by the ALJ, Plaintiff satisfied the insured status requirement for a claim under Title II through March 31, 2011, which means that she must establish disability on or before that date. *See Leach v. Comm'r of Soc. Sec.*, No. CV 10-1128-PK, 2011 WL 7082543, at *1 (D. Or. Nov. 8, 2011).

Page 26 - FINDINGS AND RECOMMENDATION

impairments of rheumatoid arthritis, osteoarthritis, degenerative disc disease, posttraumatic stress disorder, obsessive compulsive disorder, pain disorder, and borderline personality disorder.[18]  At step three, the ALJ found that Plaintiff's impairments did not meet or medically equal the severity of any impairment listed in the Commissioner's regulations.[19]

Between steps three and four, the ALJ assessed Plaintiff's residual functional capacity ("RFC") and found that she could perform light work, with specified limitations.  Those limitations are that Plaintiff: (1) can lift and carry twenty pounds occasionally and ten pounds frequently; (2) can stand and walk a total of two hours in an eight-hour workday; (3) can sit a total of six hours in an eight-hour workday; (4) can occasionally climb ramps and stairs; (5) should never climb ladders, ropes or scaffolds; (6) can occasionally stoop, kneel, crouch, crawl, and reach overhead; (7) should avoid exposure to unprotected heights, dangerous machinery and other hazards; (8) can work in proximity to coworkers at a job that does not require teamwork; (9) should have only superficial contact with the public; and (10) can remember, understand and carry out simple and detailed, but not complex instructions or tasks typical of jobs with an SVP of one or two.

Moving on to step four, the ALJ found that Plaintiff could not perform her past relevant work as a merchandise displayer, general

---

[18] The ALJ rejected Plaintiff's contention that fibromyalgia was a severe impairment.

[19] The Listing of Impairments is found at 20 C.F.R. Part 404, Subpart P, Appendix 1, and described at 20 C.F.R. §§ 404.1525, 404.1526, 416.925, 416.926.

Page 27 - FINDINGS AND RECOMMENDATION

merchandise sales person, cashier-checker, fast food worker, retail store manager, and kitchen helper. And at step five, with the VE's assistance, the ALJ determined that there were jobs in significant numbers in the national economy that Plaintiff could perform, including cashier II and office helper. Thus, the ALJ concluded that Plaintiff was not disabled from her alleged disability onset date of March 31, 2006, through the date last insured of March 31, 2011.

## STANDARD OF REVIEW

The Court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'" *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). Substantial evidence is "'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bray*, 554 F.3d at 1222 (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The Court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*, 180 F.3d at 1097). Instead, the Court must consider the entire record, weighing both the evidence that supports the Commissioner's conclusions, and the evidence that detracts from those conclusions. *Holohan*, 246 F.3d at 1097. However, if the evidence as a whole can support more than one rational interpretation, the ALJ's decision must be upheld; the Court may not substitute its judgment for the

ALJ's. *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

**DISCUSSION**

On appeal, Plaintiff argues that the Commissioner's adverse disability determination should be reversed for two independent reasons: (1) the ALJ failed to provide appropriate reasons for giving little weight to the opinion of Dr. Barry, an examining psychologist; and (2) the ALJ erred at step five when she concluded that Plaintiff could perform the jobs of cashier II and office helper.  The Court will address Plaintiff's arguments in turn.

**A.  Dr. Barry's Testimony**

To reject an uncontradicted opinion of an examining psychologist, an ALJ must provide clear and convincing reasons that are supported by substantial evidence. *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005); *Salchenberg v. Colvin*, 534 F. App'x 586, 588 (9th Cir. 2013).. If the examining psychologist's opinion is contradicted, however, an ALJ is only required to provide specific and legitimate reasons that are supported by substantial evidence. *Bayliss*, 427 F.3d at 1216.

Plaintiff does not dispute that the ALJ was only required to provide specific and legitimate reasons for giving little weight to Dr. Barry's opinion. (Pl.'s Reply Br. at 1) ("Plaintiff reasserts her argument that the ALJ failed to give specific and legitimate reasons . . . for rejecting the opinion of examining doctor Steven Barry from September 2009."). Specific and legitimate reasons for rejecting an examining psychologist's "opinion may include . . . reliance on a claimant's discredited subjective complaints, inconsistency with medical records, inconsistency with a claimant's

testimony, and inconsistency with a claimant's daily activities."
*Lowery v. Colvin*, No. 3:12-cv-02103-CL, 2014 WL 183892, at *5 (D.
Or. Jan. 14, 2014).

Dr. Barry diagnosed: (1) posttraumatic stress disorder,
obsessive compulsive disorder, opioid dependence self-reported to
be in remission, and pain disorder associated with psychological
factors and Plaintiff's general medical condition (Axis I); (2)
borderline personality disorder (Axis II); (3) self-reports of back
pain and fibromyalgia (Axis III); (4) psychosocial and
environmental stressors, such as children living on their own,
fibromyalgia, poor coping skills, lack of mental health treatment,
and applying for social security benefits (Axis IV); and (5) a GAF
rating of 38-50, noting self-reports of debilitating depression and
pain (Axis V).

Dr. Barry expressed "substantial pessimism about meaningful
and positive change in the future." (Tr. 526.) The most serious
impairments, according to Dr. Barry, are in the following areas:
(1) Plaintiff "could not be counted on to be consistent and
dependable vis-a-vis getting to work on a regular basis"; (2)
Plaintiff's "symptoms, her 'emotional reasons' are very public and
'out there' and . . . would rub off on others and interfere around
others"; and (3) Plaintiff's somatic focus and "poor management and
control of affect . . . would interfere with her being able to
attend and focus on the job she might have." (Tr. 527).

Before addressing Dr. Barry's opinion, the ALJ made the
following statements regarding Gossling's treatment notes:

> [The claimant] is described by her therapist as
> adequately groomed, cooperative, conversant, euthymic,
> affect appropriate, speech normal, thoughts logical and

Page 30 - FINDINGS AND RECOMMENDATION

1   linear, and insightful.    There is a note that the
2   claimant is a good historian regarding medications and
    efficacies, which tends to weaken her claims of memory
3   loss and the alleged severity of [fibromyalgia-related
    mental fog].   Treatment notes show that even though she
4   is on high doses of Paxil and [Ritalin], there are no
    side effect problems and she reported being more
5   functional on these med[ications] than she has ever been,
    which suggests that the claimant's mental impairments are
6   helped by medication.   Further, the claimant's therapist
    noted that she was not feeling compulsive about finishing
7   tasks.

8   (Tr. 39) (citing Gossling's treatment notes, Ex. 20F).   In the next

9   paragraph, the ALJ addressed Dr. Barry's opinion, stating:

10  [Dr. Barry] performed a psychodiagnostic examination and
    found that [the claimant] would have problems focusing on
11  the job.   The diagnosis was PTSD, OCD, opioid dependence
    in early full remission, pain disorder, borderline
12  personality disorder, and her global assessment of
    functioning score was 38-50 because she has times when
13  she is less able to function.   This opinion is given
    little weight because [Linda Gossling]'s notes regarding
14  the claimant's mental condition, and even physical
    reports [from the claimant during her consultations with
15  Gossling], seem to suggest she is doing fine and do not
    show any consistent severe problems with her mental
16  status.

17  (Tr. 39) (internal citations omitted).

18      The Court believes the ALJ met the specific and legitimate

19  standard.   In addition to discussing several other inconsistent

20  medical opinions at length, the ALJ identified inconsistency with

21  medical records provided by Gossling.   The ALJ also noted the

22  conflict between Dr. Barry's opinion and reports regarding

23  Plaintiff's well-being, activities of daily living and general

24  mental capabilities.   The ALJ's observations are consistent with

25  the longitudinal record.   Roughly one month after Dr. Barry's

26  examination, for example, Plaintiff told Crockford that she was

27  "[d]oing pretty good," Ritalin had "really helped" and she was

28  "able to do more physically."   (Tr. 567.)   Yet, Plaintiff

Page 31 - FINDINGS AND RECOMMENDATION

1  volunteered to Dr. Barry that depression would prevent her from
2  working.

3      It should also be noted that Dr. Barry's one-time examination
4  appears to have been based primarily on Plaintiff's reports and
5  subjective complaints.   It does not appear that Dr. Barry was
6  provided with entirely accurate information regarding Plaintiff's
7  work  history,  sobriety,  use  of  narcotic  medications  between
8  approximately December 2007 and March 2009, and improvements once
9  painkillers were no longer being prescribed by the Division Street
10 Family Practice.  Nor does it appear that Dr. Barry was aware that
11 Plaintiff felt that her level of functioning was actually decreased
12 by her abuse of certain medications.  (Tr. 339, 345.)  The above
13 information  is  significant  in  the  context  of  a  one-time
14 examination.

15      In short, the Court concludes that the ALJ provided specific
16 and legitimate reasons that were supported by substantial evidence
17 for giving less weight to Dr. Barry's opinion.  Even if that were
18 not true, the Court would nevertheless conclude that the failure
19 amounted to a harmless error because it would not have affected the
20 outcome of the case.  *See Coito v. Colvin*, No. 6:12-CV-00795-CL,
21 2013 WL 5234123, at *6 (D. Or. Aug. 6, 2013) ("Because the error to
22 not  present  specific  and  legitimate  reasons  to  exclude  the
23 [treating physician's opinions] did not affect the outcome of the
24 case, it is a harmless error and does not require reversal."),
25 *rev'd on other grounds*, 2013 WL 5225019, at *1 (D. Or. Sept. 13,
26 2013) (report and recommendation inaccurately stated that the
27 Commissioner had denied an application for Supplemental Security
28 Income under Title XVI); *see also Cantrall v. Colvin*, 540 F. App'x

Page 32 - FINDINGS AND RECOMMENDATION

607, 609 (9th Cir. 2013) (applying harmless error analysis in a manner consistent with this Court's recommendation).

Indeed, the record clearly supports the ALJ's decision to discount Plaintiff's testimony——a matter that has not been contested on appeal——which means the ALJ is free to disregard Dr. Barry's opinion because it was premised to a large extent on Plaintiff's subjective complaints and inaccurate reports. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) ("Because the present record supports the ALJ in discounting [plaintiff]'s credibility, as discussed above, he was free to disregard [the examining physician]'s opinion, which was premised on her subjective complaints."); *see also Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) ("An ALJ may reject a treating physician's opinion if it is based 'to a large extent' on a claimant's self-reports that have been properly discounted as incredible.") (citation omitted). From that alone it follows that any alleged error was harmless, insofar as it would not have affected the outcome of the case.

**B.    Step Five Finding**

With respect to the ALJ's step five determination, Plaintiff essentially argues that the DOT's descriptions of cashier II and officer helper are inconsistent with her ultimate RFC determination, and the ALJ failed to adequately address or resolve the conflicts between the DOT and VE's testimony.

It is settled law that the ALJ must first determine whether a conflict exists between the DOT and testimony of the VE. *Massachi v. Astrue*, 486 F.3d 1149, 1153 (9th Cir. 2007). "If it does, the ALJ must then determine whether the [VE]'s explanation for the

Page 33 - FINDINGS AND RECOMMENDATION

conflict is reasonable and whether a basis exists for relying on the expert rather than the [DOT]." *Id.* The Ninth Circuit has recognized, however, that a harmless procedural error occurs when the ALJ fails to ask the VE whether her "testimony conflicted with the DOT and, if so, whether there was a reasonable explanation for the conflict . . . where no conflict existed or the [VE] provided 'sufficient support for her conclusion' so as to justify any potential conflicts." *Lind*, 370 F. App'x at 817 (quoting *Massachi*, 486 F.3d at 1153-54 & n.19).

The Court begins by addressing Plaintiff's claim the ALJ's limitation to reaching overhead bilaterally on an occasional basis is inconsistent with an ability to perform the jobs of officer helper and cashier II because both jobs are identified as requiring frequent reaching under the SCO. In *Lee v. Astrue*, No. 6:12-cv-00084-SI, 2013 WL 1296071 (D. Or. Mar. 28, 2013), the RFC determination stated that the claimant could "reach overhead occasionally with her left arm and frequently with her right arm," *id.* at *3, and based on the hypotheticals posed to the VE, the ALJ concluded that the claimant could perform the jobs of mail clerk, office helper (DOT 239.567-010) and assembler of printer products, *id.* at *10.

Judge Simon rejected the claimant's argument that the ALJ erred by not identifying and resolving a conflict between the DOT and VE's testimony, stating:

> The first two occupations, according to the DOT, require 'reaching' frequently, while the third requires 'reaching' constantly. The [SCO], a companion to the DOT, defines 'reaching' to mean 'extending hand(s) and arm(s) in any direction.' The DOT does not further specify whether a particular occupation requires reaching overhead or requires reaching with both hands equally.

Page 34 - FINDINGS AND RECOMMENDATION

1

. . . .

2

3         The courts are divided on the question of whether
'reaching' in the DOT requires the ability to reach in
4   all directions, or whether 'reaching,' 'handling,' or
'fingering' in the DOT requires the ability to use both
5   arms or hands, and there is no controlling precedent.
Without attempting to resolve this division or state a
6   general rule, the Court determines that there was no
apparent conflict between the DOT and the VE's testimony
7   in this particular case.

8         There is no direct conflict between the DOT and the
VE's testimony.  For the Court to find a conflict on
9   these facts, it would have to read into the DOT's
description of the mail clerk and office helper
10  occupations a requirement of overhead reaching with both
arms on a more than-occasional basis (which the DOT
11  defines as more than one-third of the time).  In this
regard, the Court notes that the DOT's general
12  descriptions for these occupations do[es] not include
work activities involving frequent bilateral overhead
13  reaching.  The Ninth Circuit has held that an ALJ must
provide further explanation when the claimant's RFC
14  'contradicts' or 'fails to comport with' the DOT.
Although there may be situations where a contradiction is
15  not explicit, the potential conflict identified by [the
claimant] appears to be speculative at best. . . .

16        Because there is no apparent conflict between the
VE's testimony and the DOT in this case, the ALJ's
17  failure to inquire of the VE whether her testimony was
consistent with the DOT was harmless error.  Given the
18  testimony of the VE, there is sufficient evidence in the
record to support the ALJ's finding at Step Five and,
19  therefore, his ultimate finding that [the claimant] is
not disabled.

20

21  *Id.* at *11 (internal citations and footnotes omitted).[20]

22

23        [20] "Performs any combination of following duties in business
office of commercial or industrial establishment: Furnishes workers
24  with clerical supplies.  Opens, sorts, and distributes incoming
mail, and collects, seals, and stamps outgoing mail.  Delivers oral
25  or written messages.  Collects and distributes paperwork, such as
records or timecards, from one department to another.  Marks,
26  tabulates, and files articles and records. May use office
equipment, such as envelope-sealing machine, letter opener, record
27  shaver, stamping machine, and transcribing machine.  May deliver
items to other business establishments. . . . May specialize in
28  delivering mail, messages, documents, and packages between

Page 35 - FINDINGS AND RECOMMENDATION

For there to be a conflict on the facts in this case, the Court would similarly have to read into the DOT's description of the office helper and cashier II jobs a requirement of overhead reaching with both arms on a more than an occasional (one-third of the time) basis.  It is of particular note that these jobs do not include work activities involving frequent bilateral overhead reaching.  Judge Simon observed the same in *Lee* with respect to the job of officer helper.  The job of cashier II is no different:

> Receives cash from customers or employees in payment for goods or services and records amounts received: Recomputes or computes bill, itemized lists, and tickets showing amount due, using adding machine or cash register.  Makes change, cashes checks, and issues receipts or tickets to customers.  Records amounts received and prepares reports of transactions.  Reads and records totals shown on cash register tape and verifies against cash on hand.  May be required to know value and features of items for which money is received.  May give cash refunds or issue credit memorandums to customers for returned merchandise.  May operate ticket-dispensing machine.  May operate cash register with peripheral electronic data processing equipment by passing individual price coded items across electronic scanner to record price, compile printed list, and display cost of customer purchase, tax, and rebates on monitor screen. May sell candy, cigarettes, gum, and gift certificates, and issue trading stamps.  May be designated according to nature of establishment as Cafeteria Cashier (hotel & rest.);  Cashier, Parking Lot (automotive ser.); Dining-Room Cashier (hotel & rest.); Service-Bar Cashier (hotel & rest.); Store Cashier (clerical); or according to type of account as Cashier, Credit (clerical); Cashier, Payments Received (clerical). May press numeric keys of computer corresponding to gasoline pump to reset meter on pump and to record amount of sale and be designated Cashier, Self-Service Gasoline (automotive ser.). May receive money, make change, and cash checks for sales personnel on same floor and be designated Floor Cashier (clerical).  May make change for patrons at places of amusement other than gambling establishments and be designated Change-Booth Cashier (amuse. & rec.).

---

departments of establishment and be designated Messenger, Office (clerical)."  DOT 239.567-010, 1991 WL 672232 (officer helper).

Page 36 - FINDINGS AND RECOMMENDATION

DOT 211.462-010, 1991 WL 671840 (cashier II).  Accordingly, the Court declines to find reversible error on this ground.

Plaintiff also argues that the VE's testimony is less than definitive regarding the amount social interaction required of both positions.  The RFC determination indicates that Plaintiff "should have only superficial contact with the public and can work in proximity to coworkers, but not in an environment that requires teamwork." (Tr. 36.)  The VE clearly testified that jobs of office helper and cashier II were appropriate for an individual with these limitations, but she conceded that she could not "say 100 percent no teamwork [ever]" with respect to the job of cashier II.  (Tr. 106.)

The Court finds no reversible error here based on the job of officer helper.  *See generally Tamayo v. Colvin*, No. 12-cv-8484, 2013 WL 5651420, at *2 (C.D. Cal. Oct. 11, 2013) ("The Commissioner's burden . . . is satisfied by showing the existence of only one job with a significant number of available positions that the claimant can perform.").  In *Cooley v. Astrue*, No. 2:10-cv-00076, 2011 WL 916175 (N.D. W. Va. Feb. 25, 2011), similar to Plaintiff's case here, the district court found no reversible error based solely on the job of office helper, where the plaintiff could only have limited contact with the public, coworkers and supervisors, and the VE testified that the job of office helper was appropriate because it involved "working pretty much alone, and the issues of supervision and dealing with coworkers [were] reduced, although not totally eliminated." *Id*. at *8-9.

Similarly, in *Plum v. Astrue*, No. 08-CV-6121-HU, 2009 WL 3627966 (D. Or. Oct. 29, 2009), this Court affirmed the

Page 37 - FINDINGS AND RECOMMENDATION

1  Commissioner's adverse disability determination in a case where the

2  VE testified the plaintiff, who was "capable of routine,

3  superficial, or occasional [social] interaction that d[id] not

4  require ongoing need for cooperative or collaborative teamwork

5  interaction," could perform the job of office helper. *Id.* at *15;

6  *see also Hall v. Astrue*, No. 1:09 CV 2514, 2010 WL 5621291, at *14

7  (N.D. Ohio Dec. 23, 2010) (collecting cases, including one where

8  the job of office helper was deemed appropriate for a claimant who

9  was restricted to work "that did not involve any more than brief

10  superficial contact with coworkers, [and] no interaction[] with the

11  general public").

### CONCLUSION

13  For the reasons stated, the Commissioner's decision should be

14  AFFIRMED.

### SCHEDULING ORDER

16  The Findings and Recommendation will be referred to a district

17  judge. Objections, if any, are due **April 21, 2014.** If no

18  objections are filed, then the Findings and Recommendation will go

19  under advisement on that date. If objections are filed, then a

20  response is due **May 8, 2014.** When the response is due or filed,

21  whichever date is earlier, the Findings and Recommendation will go

22  under advisement.

23  Dated this  31st  day of March, 2014.

24  /s/ Dennis J. Hubel
_____
25  DENNIS J. HUBEL
United States Magistrate Judge

Page 38 – FINDINGS AND RECOMMENDATION